**MORGAN GUARANTY TRUST COMPANY OF NEW YORK, et al., Plaintiffs,**

v.

**The M/V GRIGORIOS C. IV, et al., Defendants.**

No. 83–6268.

United States District Court, E.D. Louisiana.

Aug. 20, 1985.

---

**10.** These facts provide the "exceptional circumstance" required by F.R.Civ.P. 53(b).

Henry Read, Daniel Lund and Stanley McDermott, III, Montgomery, Barnett, Brown & Read, New Orleans, La., J. Bond Smith and John Loflin, Lord, Day & Lord, New York City, for plaintiffs.

Walter Carroll, Jr., Terriberry, Carroll & Yancey, New Orleans, La., Alfred E. Yudes, Jr., Burlingham, Underwood & Lord, New York City, for defendants.

## MEMORANDUM AND ORDER

SEAR, District Judge.

Plaintiffs, Morgan Guaranty Trust Company ("Morgan"), Continental Illinois National Bank and Trust Company of Chicago ("Continental"), National Westminister Bank USA, Inc. ("Nat West"), and Banque De La Societe Financiere Europeenne ("BSFE") (collectively, "the Plaintiffs') brought this action *in rem* on December 30, 1983 to foreclose on a First Preferred Greek Ship Mortgage which they held on the M/V Grigorios. The Grigorios is of Greek registry and the mortgage was given as partial security for an $80 million revolving credit and term loan facility ("the Loan Agreement") funded by the Plaintiffs in favor of the ship's owner, Hellenic Lines, Ltd. ("Hellenic"), a Greek stock corporation.

The vessel was arrested in the Port of New Orleans on January 4, 1984 and, on unopposed motion of the Plaintiffs, was sold on February 29, 1984 for $1,270,000 pursuant to Supplemental Admiralty Rule

E(9)(b). Under the terms of the order for the sale of the vessel, the time for filing liens ran until 30 days after the sale, or through March 30, 1984. Accordingly, on April 5, 1984, the Plaintiffs' motion to default all lienholders who had not timely intervened was granted.

Numerous parties intervened before and after the sale to recover monies allegedly owed them for supplies or services rendered to the vessel.[1]

One of the intervenors, Mobil Sales and Supply Corporation ("Mobil"), contends that the mortgage which the Plaintiffs claim on the Grigorios is not a valid preferred ship mortgage under the Ship Mortgage Act, 46 U.S.C. § 911 *et seq.*, and that even if it is, its lien for supplies provided to the vessel is superior to the Plaintiffs' mortgage lien under 46 U.S.C. § 951. Trial was conducted on these issues and after consideration of the evidence, the arguments of ·counsel, the pre- and post-trial memoranda of the parties, and the law applicable to the case, I now make the following findings of fact and conclusions of law.

## I. Background

Hellenic was founded by Pericles Callimanopoulos. When he died on September 20, 1979, he left the bulk of his shares in the corporation to his son, Grigorios (59.375%), and the remainder to his wife and daughters. The wife and daughters thereafter brought an action in the Court of First Instance of Pireaus, Greece contesting the validity of his will. Although the validity of the will was initially upheld,[2] the Greek court later ruled that the wife and daughters may be entitled to a larger share of Callimanopoulos' estate. As a "conservatory measure" pending an accounting of the succession, the court ap-pointed an administrator to control the shares of Hellenic which formed part of the succession.[3] On April 7, 1982, an Extraordinary General Meeting of Hellenic's shareholders was convened in accordance with the instructions of the court for the purpose of electing a new Board of Directors. At that meeting, the court-appointed administrator voted the shares of the succession. The new Board of Directors then scheduled another Extraordinary General Meeting of Hellenic's shareholders for June 1, 1982. When dissident shareholders sought to prevent that meeting on the ground that it would jeopardize their interests, the court reaffirmed the authority of its administrator and refused to enjoin the June 1, 1982 meeting. Prior to the meeting, however, on May 31, 1982, Callimanopoulas' heirs entered into an agreement providing for the distribution of voting rights to the shares of the succession. At the meeting of June 1, 1982, a new Board of Directors was elected in accordance with the May 31, 1982 shareholders agreement.

At the end of 1982, Hellenic had several loans outstanding with Continental and Morgan totalling approximately $69.9 million. These loans were secured in part by mortgages on seven ships owned by Hellenic and in part by a pledge of marketable securities. At that time, there was a worldwide recession which severely depressed the shipping market and made it difficult for Hellenic to fulfill its obligation to repay these loans. Hellenic therefore sought to refinance its debt in a manner that would permit it to defer temporarily payments on the principal of the loans and to increase its liquidity. Morgan and Continental both declined to refinance the debt until Hellenic obtained additional working capital.

---

1. Several of the intervenors later voluntarily dismissed their interventions. The Plaintiffs have stipulated to the validity and priority of the liens asserted by four of the intervenors which total $79,572.77. One party, Jerome Brown, failed to intervene before the deadline established by the order for sale. Because Brown's claim did not arise until after the deadline and because the claims of the other intervenors had not yet been adjudicated, he was nevertheless permitted to intervene on January 2, 1985.

Brown's claim arises from personal injuries he allegedly sustained while working aboard the vessel in 1979. That claim is presently set for trial on December 16, 1985.

2. Judgment No. 2285 of 1981, Court of First Instance of Piraeus, Greece.

3. Judgment No. 352 of 1982, clarified by Judgment No. 871 of 1982, Court of First Instance of Piraeus, Greece.

Hellenic obtained the additional capital by arranging for two other banks, BFSE and Nat West, to participate in refinancing its debt. Management and documentation of the refinancing were initially handled by Continental, but were later overseen by Morgan after it became apparent that Morgan would fund the majority of the refinancing. On April 28, 1983, Hellenic and the Plaintiffs executed the Loan Agreement[4] which provided that Hellenic would receive $80 million of revolving credit that would convert to a six year term loan after December 31, 1984.[5] The Loan Agreement also provided that Continental and Morgan would release the securities pledged to them by Hellenic. Thus, under the Loan Agreement, Hellenic obtained about $10.1 million of new credit, deferral of the roughly $32 million in principal payments that would have been due during 1983 and 1984 under the earlier loans by Continental and Morgan to Hellenic, and the release of approximately $7 million of securities pledged by Hellenic to Continental and Morgan.

In exchange, the Plaintiffs were given mortgages on the seven Hellenic vessels that were previously mortgaged to Continental and Morgan, as well as mortgages on four additional ships, including the Grigorios.[6] The ship mortgages, however, were not fully executed at the time that the Loan Agreement was signed. Initially, the parties contemplated execution of the ship mortgages in Greece and execution of the Loan Agreement and other documents in New York. Two or three days prior to closing, Morgan notified the Plaintiffs'

New York counsel, R. Theodore Ammon, that it would not execute a power of attorney to permit the Plaintiffs' Greek counsel, Theo V. Sioufas, to execute the mortgages in Greece. Consequently, the signing of the mortgages was rescheduled to New York.

Although Hellenic's Board of Directors had authorized on April 19, 1983 its New York representatives to execute all documents relevant to the Loan Agreement, when Sioufas was informed that the mortgages would be signed in New York rather than Greece, he recommended that Hellenic's Board of Directors execute a notarial power of attorney in favor of Anatasios Pitenis, Hellenic's representative who would sign the mortgages in New York. Sioufas believed at that time that under New York law, the mortgages would be executed in notarial form and that a notarial power of attorney was necessary to enable Pitenis, a non-director of Hellenic, to execute the mortgages. A meeting of Hellenic's Board of Directors could not be scheduled until after April 28, 1983, when the documents were to be signed in New York. Consequently, at the closing on April 28, 1983, two copies of each of the ship mortgages were reserved for signing by Pitenis after the power of attorney had been executed by Hellenic's Board. Therefore, at the April 28, 1983 closing, he executed only eight copies of each of the ship mortgages; he executed all ten copies of all of the other documents. The Plaintiffs, however, executed all copies of each of the documents, including the two reserved copies of the ship mortgages.[7]

---

4. Although the Loan Agreement was executed on April 28, 1983, it was "dated as of March 31, 1983."

5. The amounts funded by each of the Plaintiffs were: Morgan, $40 million; Continental, $30 million; BSFE, $1 million; and Nat West, $5 million.

6. The other vessels mortgaged were: Hellenic Valor, Hellenic Innovator, Hellenic Explorer, Hellenic Sun, Hellenic Wave, Hellenic Pride, Hellenic Star, Hellenic Champion, Hellenic Ideal, and Hellenic Friendship. The Hellenic Friendship, however, was not owned by Hellenic, but by Universal Cargo Carriers, Inc., a relat-

ed corporation. This vessel was mortgaged under the Loan Agreement pursuant to Universal's guarantee of Hellenic's debt.

7. The closing of the Loan Agreement and execution of the documents took place in the New York offices of the Plaintiffs' counsel. Because all of the documents had been prepared in anticipation of execution on April 28, 1983, the date line of the notarial jurat on the acknowledgments and the affidavits of good faith that were attached to the mortgages had been typed as "April __, 1983." Pitenis was not to execute the two reserved copies of the ship mortgages until after Hellenic's Board met on May 2, 1983; therefore, Ammon instructed an associate of his

Hellenic's Board of Directors met on May 2, 1983 and issued a resolution authorizing two members of the Board to execute a notarial power of attorney in favor of Pitenis. Immediately after the power of attorney was executed, Pitenis executed in New York the two reserved copies of each of the mortgages. The mortgages were subsequently taken to the county clerk's office for certification of the notaries' signatures, and then to the Greek consulate for certification of the county clerk's signature. Thereafter, the mortgages were taken to Greece by Pitenis and delivered to Sioufas who registered them on May 3, 1983 in Piraeus, Greece, the port in which the Grigorios and the other vessels were registered. Simultaneously with the recordation of the ship mortgages in Greece, the Plaintiffs released the $80 million of credit to Hellenic. That day, Hellenic drew $73 million against its credit and repaid its prior obligations of about $69.9 million to Continental and Morgan.

Hellenic paid on August 3, 1983 the first installment of interest that it owed under the Loan Agreement, but failed to pay the second installment which was due on November 3, 1983. The Plaintiffs formally declared Hellenic to be in default on November 23, 1983 and notified Hellenic that they were exercising their right under the Loan Agreement to accelerate repayment of the entire outstanding amount of credit

extended to Hellenic. They began filing foreclosure actions *in rem* and arresting Hellenic's vessels on November 25, 1983.

Hellenic filed for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* on December 12, 1983 in the Southern District of New York. On January 20, 1984, Bankruptcy Judge Burton R. Lifland ordered that the automatic stay provided by § 362 of the Bankruptcy Code be lifted so that any party could proceed with actions *in rem* against the mortgaged vessels.

## II. Validity of the Mortgage

Although Mobil initially advanced several arguments as to why the mortgage claimed by the Plaintiffs is not a valid preferred ship mortgage under the Ship Mortgage Act, the pre- and post-trial briefs, as well as the proposed findings of fact and conclusions of law which it submitted, indicate that Mobil abandoned all but three challenges to the preferred status of the mortgage. First, Mobil claims that the mortgage fails to meet the prerequisites for creation of a preferred ship mortgage under the Ship Mortgage Act. Second, Mobil contends that Hellenic's board of directors lacked authority to mortgage the vessel. Third, Mobil asserts that Hellenic was insolvent at the time the mortgage document was executed and therefore the mortgage was a nullity.

law firm to change the date line of the notarial jurats on the acknowledgments and affidavits of good faith of Hellenic which were attached to the two reserved copies to "May ___, 1983." The associate, however, failed to follow Ammon's instructions and changed the date line of the jurats on the acknowledgments of the Plaintiffs as well.

Two notaries were present at the signing of the documents on April 28, 1983. They were introduced to the persons who would be signing the documents on behalf of Hellenic and the Plaintiffs. Those persons were told that the notaries would sign the acknowledgments·and, with respect to Hellenic, the affidavits of good faith. After the documents had been executed by the parties, the notaries signed and sealed the acknowledgments and the affidavits of good faith on all of the mortgages except for the two reserved copies. On those copies, the notaries signed and sealed only the acknowledgments with respect to the Plaintiffs. The date lines of

the notarial jurats were incorrectly completed by Ammon's associate with the date of closing, May 3, 1983, rather than with the date on which the notaries had in fact signed the jurats.

The same notaries were also present at the signing of the two reserved copies of the ship mortgages by Pitenis on May 2, 1983. After signing of the mortgages by Pitenis, the notaries signed and sealed the jurats on the acknowledgments and affidavits of good faith. Ammon's associate also incorrectly dated the notarial jurats on these documents as of May 3, 1983. In preparing the documents for shipment to Greece, Ammon noticed that his associate had incorrectly dated the jurats on the acknowledgments by Hellenic, and instructed his associate to change the date to May 2, 1983 to reflect the date on which the jurat had actually been signed. Ammon did not notice that the jurat on the acknowledgment by the Plaintiffs were also incorrectly dated May 3, 1983.

■ The Ship Mortgage Act provides that a preferred mortgage constitutes "a lien upon the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by such vessel." 46 U.S.C. § 951. Both domestic and foreign ship mortgages can qualify as preferred mortgages under the Ship Mortgage Act. Section 951 of Title 46 provides that:

the term 'preferred mortgage' shall include, in addition to a preferred mortgage made pursuant to the provisions of this chapter [i.e., a domestic preferred mortgage created under 46 U.S.C. § 922], any mortgage, hypothecation or similar charge created as security upon any documented foreign vessel ... if such mortgage, hypothecation, or similar charge had been duly and validly executed in accordance with the laws of the foreign nation under the laws which the vessel is documented and has been duly registered in accordance with such laws in a public register ...; and the term 'preferred mortgage lien' shall also include the lien of such mortgage, hypothecation, or similar charge....

Mobil does not dispute that the mortgage creates a security interest in the vessel in favor of the Plaintiffs.[8] Thus, because the Grigorios is a vessel documented under the laws of Greece, the mortgage constitutes a preferred ship mortgage under § 951 if it was executed in accordance with Greek law and recorded in the proper Greek public register.

At trial, four experts in Greek law, Sioufas, Paul C. Aurameas, Professor A.N. Yiannopoulas, and Aristides P. Kalamiotis, testified regarding the Greek law governing ship mortgages. The first three testified for the Plaintiffs, and the fourth for Mobil. Much of the testimony of the witnesses was substantially similar. That testimony indicated that there are two requirements to establish any mortgage in Greece. There must be a title of mortgage, and that title must be registered in the appropriate public records. With respect to ships, a title of mortgage may be created only by the will of the parties expressed in a formal or informal instrument.

Greek law provides for two types of ship mortgages, simple and preferred. Both convey to the creditor the right to proceed *in rem* against the ship to satisfy the debt after default by the debtor. A Greek simple ship mortgage is like a preferred ship mortgage in the United States created under 46 U.S.C. § 922 in that it provides for foreclosure and judicial sale of the vessel upon default on the debt. In addition, a Greek preferred ship mortgage allows the creditor another means to satisfy the debt after default of the debtor. The creditor holding a Greek preferred ship mortgage may take over the proceeds from the vessel's operation. The mortgagor in a preferred ship mortgage may also give the creditor the right to sell the ship in a private sale and apply the proceeds to the debt.

Under the Greek Code of Private Maritime Law, a simple ship mortgage may be created either by an informal instrument (i.e., an unilateral declaration of the debtor executed before a notary), or by a formal instrument (i.e., a contract executed by both parties before a notary). Legislative Decree No. 3899 of 1958, which governs preferred ship mortgages, provides in Article 2 that a preferred ship mortgage can be created within Greece only through a formal instrument. Where a preferred ship mortgage is executed outside of Greece, however, Article 2 permits the instrument to be in the "form required by the law of the country in which the agreement is executed." Legislative Decree No. 2687 of 1953,[9] permits the instrument to be a unilateral declaration of the debtor executed under private signature.

There is also Greek law specifically applicable to the mortgage at issue in this case. Ministerial Decision and Approval No.

---

8. Indeed, Mobil's counsel expressly conceded this point at trial.

9. Legislative Decree No. 2687 was authentically interpreted by legislative Decree No. 2928 of

1954. In accordance with the practice of Greek lawyers, reference to Legislative Decree No. 2687 herein shall also indicate reference to Legislative Decree No. 2928 of 1954.

F53521 of 1969 was issued pursuant to the authority of Legislative Decree No. 2867 of 1953 [10] and constitutes irrevocable law specifically applicable to the Grigorios.[11] Article 19 of the Ministerial Decision authorizes the vessel owner, in this case, Hellenic, to encumber the Grigorios by preferred mortgages:

> either by contract or by any other act signed before Greek notary public in accordance with the form provided for by Greek law in case the signing takes place in Greece, or, if the signing takes place abroad, in accordance with the form required or permitted by the law of the place of signing.

Thus, under Article 2 of Legislative Decree No. 3899 of 1958 and the Ministerial Decision, the experts agree that the law of the place of the signing—in this case, New York—governs the form of any instrument purporting to create a mortgage upon the Grigorios.[12]

The experts disagree, however, about what form under New York law the mortgage must take. The Plaintiffs' experts uniformly testified that for an instrument to be a valid preferred Greek ship mortgage, it need only be in a form sufficient to create a security interest under New York law. Mobil's expert, Kalamiotis, stood alone in testifying that Greek law looks only to the form of instruments which create the same rights under New York law as would be created under Greek law. I find the testimony of the Plaintiff's experts more persuasive than Kalamiotis' testimony for several reasons. First, and most important, Kalamiotis' opinion is not supported by any of the Greek authorities he cited. Second, the Plaintiff's experts' interpretation of Greek law is consistent with the operation of its counterpart in the law of the United States, 46 U.S.C. § 951. That statute considers only whether a security interest has been established in the foreign vessel, and not whether the security interest constitutes a maritime lien. *See State of Israel v. M/V Nili*, 435 F.2d 242, 252 (5th Cir.1970), *cert. denied*, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971). Third, the testimony of the Plaintiff's experts provided a clearer explanation of Greek law. For example, Kalamiotis' testimony was ambiguous as to the precise form the instrument must take under New York law to create a valid preferred mortgage under Greek law. Furthermore, Kalamiotis did not include this point in his expert report. Indeed, he expressed it for the first time at trial. If Greek law were as he testified, one would have expected him to have included it in his report. I therefore credit the testimony of the Plaintiff's experts and find that a mortgage of any form sufficient to create, as between the parties, a security interest under New York is a proper form of title under Greek law.

New York law specifically provides for the enforcement of a security interest as between the parties where: (1) the debtor has signed a security agreement which contains a description of the collateral; (2) value has been given; and (3) the debtor has rights in the collateral. N.Y.U.C.C. § 9–203. The mortgage in this case meets these requirements and is therefore in proper form under Greek law.

---

**10.** The Ministerial Decision, dated January 8, 1970, was issued jointly by the Greek Ministers of Coordination, Mercantile Marine and Finance, and published in the January 23, 1970 edition of the official Government Gazette.

**11.** Before the Grigorios was completed, it was registered as Hull No. 1076 in accordance with Article 4 of the Greek Code of Private Maritime Law which permits registration of a vessel at any time after construction has begun.

**12.** At trial, however, Kalamiotis offered this as only one possible interpretation. He also suggested that the laws of Greece may govern the form of the instrument. He theorized that because New York law provides that a mortgage on a ship of a foreign flag is governed by the laws of the flag state, Greek law governed the mortgage in this case in all respects. Although he claimed to have authority for this opinion, his testimony revealed none. Moreover, his opinion is directly contradicted by Article 32 of the Greek Civil Code which expressly declares:

> When foreign law is to be applied, the rules of conflict of law of the foreign state are not part of the applicable law.

Furthermore, counsel for Mobil conceded at trial that New York law governed the form of the mortgage.

Although Mobil conceded at trial that the mortgage created a security interest in the vessel in favor of the Plaintiffs, Mobil nevertheless argues that New York law is inapplicable. Mobil claims that Article 9 of the N.Y.U.C.C. does not apply:

to a security interest subject to any statute of the United States, to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of properties.

N.Y.U.C.C. § 9–104(a). That argument, however, is incorrect. The plain language of § 9–104 suggests that Article 9 is inapplicable only to the extent that the federal statute applies. The commentary to § 9–104 confirms this interpretation:

[w]here a federal statute regulates the incidents of security interests in particular types of property, those security interests are of course governed by the federal statute and excluded from this Article. The Ship Mortgage Act, 1920, is an example of such a federal act.... Even such a statute as the Ship Mortgage Act is far from a comprehensive regulation of all aspects of ship mortgage financing. That Act contains provisions on formal requisites, on recordation and on foreclosure but not much more. If problems arise under a ship mortgage which are not covered by the Act, the federal admiralty court must decide whether to improvise an answer under 'federal law' or to follow the law of some state with which the mortgage transaction has appropriate contacts. The exclusionary language in paragraph (a) is that this Article does not apply to such security interest 'to the extent' that the federal statute governs the rights of the parties. **Thus if the federal statute contained no relevant provision, this Article could be looked to for an answer.**

(Emphasis added). In this case, the provisions of the Ship Mortgage Act governing foreign ship mortgages do not specify the formal requisites of a foreign ship mortgage. Hence, under Greek law, Article 9 of the N.Y.U.C.C. controls the form of the mortgage and the mortgage is of proper form.

Mobil also argues vigorously that the mortgage is invalid under Greek law because of alleged informalities in the dating of the notarial jurats on the acknowledgments and on Hellenic's affidavit of good faith. Neither acknowledgments nor an affidavit of good faith, however, are required under New York law to establish a security interest in property. Thus, any informality in the dating of the notarial jurats is irrelevant under Greek law.

In addition to meeting the requirements of New York law as to form, a valid title of a Greek preferred ship mortgage must meet the requirements of Greek law regarding substance. Article 3(a) of Legislative Decree No. 3899 of 1958 provides that the mortgage must identify the creditor, the debtor, the debt which the mortgage secures, the maturity date, and the ship. The Plaintiffs' experts all testified the mortgage contains all of the information necessary under Greek law to be a valid title of preferred ship mortgage. Notwithstanding the opinion of Kalamiotis to the contrary, I agree.

Greek law also requires that the grantor of the mortgage be the owner of the vessel or a person acting under authority of the owner. *See* Code of Private Maritime Law, Art. 204; Greek Civil Code Art. 1265(2); Legislative Decree No. 3899 of 1958, Art. 22. Thus, this provision of Greek law was satisfied if Pitenis was properly authorized to act on behalf of Hellenic. Whether Pitenis was properly authorized turns on whether Hellenic's Board of Directors had the authority to appoint Pitenis, and on whether the appointment was in the form required by Greek law.

Article 217 of the Greek Civil Code provides that a power of attorney "in the absence of other indication, is subject to the same form that is required for the execution of the juridical act for which the power of attorney is given." In this case, New York law did not require that the mortgage be executed in notarial form; therefore, the power of attorney in favor of Pitenis granted by the April 19, 1983 resolution of Hellenic's Board of Directors was

in a form acceptable under Greek law. Nevertheless, by resolution on May 2, 1983 before Pitenis execute the two copies of the mortgage which were registered in Greece, Hellenic's Board also granted Pitenis a power of attorney in notarial form. Consequently, the form of Pitenis' appointment would have been appropriate under Greek law even if New York law had required that the mortgages be executed in notarial form.

■ Although Mobil does not challenge the form of Pitenis' appointment, it vigorously contends that Hellenic's Board of Directors lacked authority to appoint him. Mobil first asserts that the Board lacked authority because Hellenic ceased to exist in March, 1955. Hellenic was formally constituted on March 19, 1935 through the publication of its Articles of Association in the Bulletin of Joint Stock and Limited Liability Companies of the Government Gazette, an official publication of the government of Greece. Article 4 of those Articles of Association established the term of the company at twenty years, or until March 18, 1955. However, included with the exhibits admitted into evidence, though not otherwise identified as an exhibit, is a certified and consularized copy of the Government Gazette of February 26, 1955 in which an amendment to Article 4 is published. That amendment fixes the duration of the Hellenic company at 40 years from the date of incorporation in 1935, or until March 18, 1975.[13] Article 4 was once again amended in 1970 to extend the duration of Hellenic until March 18, 1995. Accordingly, I find that Hellenic was continually in existence under Articles of Association from the time they were first promulgated in 1935 through the time that this action was brought.

■ Mobil next claims that Hellenic's Articles of Association require that any documents be signed by Hellenic's managing director or by two members of the Board of Directors, and that the Articles provide no authority for the appointment of a nondirector to execute a mortgage on behalf of the Board. Mobil, however, cites no provision of Hellenic's Articles of Association in support of the first proposition and I have found none. With respect to the second, Article 21 provides, in addition to an extensive list of the duties of the Board, that: "[i]n other words, the Board of Directors decides on all matters requiring attention for the execution of the aims of the Company and all matters in the Company's administration and protection of its interests." This language is certainly broad enough to permit the Board to authorize a non-director to execute a mortgage.

Mobil's final contention regarding the lack of authority of Hellenic's Board of Directors to appoint Pitenis is that certain decisions of the Greek courts have deprived the Board of authority to bind the corporation. Specifically, Mobil points to several actions brought by the wife and daughters of Pericles Callimanopoulas in which they have sought to have various meetings of Hellenic's shareholders declared invalid. None of the actions cited by Mobil, however, challenge the meeting of Hellenic's shareholders on June 1, 1982 at which the Board of Directors that authorized Pitenis to execute the mortgage was elected.

Moreover, the June 1, 1982 shareholders' meeting was convened by the Board of Directors elected at the April 7, 1982 meeting of Hellenic's shareholders which in turn was held in accordance with judgments of the Court of First Instance of Piraeus. Although those judgments were interlocutory, they were issued as conservatory measures in the succession proceedings. Under Greek law, decisions of a Board of Directors elected in compliance with conservatory measures stand despite subsequent modification of the interlocutory judgment. Thus, even if Callimanopoulos' dissatisfied heirs prevail in their challenge to the succession, decisions of the Board which was elected June 1, 1982 will not be affected. I therefore find that Pitenis was

---

**13.** The language of Article 4 subsequent to the 1955 amendment is identical to the text of Article 4 contained in the 1960 recodification of the Articles of Association which was admitted into evidence.

properly authorized to execute the mortgage on behalf of Hellenic.

Mobil's final challenge to the validity of the title of mortgage is its claim that Hellenic was insolvent at the time the mortgage was created and that the mortgage therefore constitutes a voidable preference under Greek bankruptcy law. Mobil, however, adduced no evidence that Hellenic was insolvent at the time the mortgage was created. Indeed, the testimony of Judith J. Plows, who is employed by Morgan as a Vice President in its shipping department and was responsible for Hellenic's business with Morgan, suggests the contrary. Moreover, when the Court of First Instance of Piraeus, Greece found Hellenic to be insolvent, it established March 31, 1984 as the date of insolvency. Relying on Kalamiotis' report, Mobil nevertheless contends that the Greek court may later redetermine the date of Hellenic's insolvency. Even if Kalamiotis' analysis of Greek law were credible, whether the Greek court will at some time in the future redetermine the date of Hellenic's insolvency is purely speculative. Consequently, I find that Hellenic was not insolvent when the mortgage was created and that the title of mortgage is valid.

The final requirement for establishing a valid Greek preferred ship mortgage is that the title of mortgage be registered. Until this is accomplished, the mortgage establishes no rights under Greek law, whether as between the parties, or as to third parties. In this case, the mortgage was registered by Sioufas in Piraeus, the port in which the ship was registered. Under Articles 1271 and 1329 of the Greek Civil Code, the registration of a mortgage in Greece is presumed valid unless: (1) the mortgagor is not the owner of the mortgaged property on the date of registration of the mortgage; (2) the mortgage fails to identify the mortgagor, the mortgagee, the mortgaged property or the amount the indebtedness secured; (3) the registration is not dated; or (4) the title of mortgage is void. Although all of the Plaintiffs' experts testified that the mortgage was properly registered, Kalamiotis alone testified that the registration was defective and therefore invalid.

The defect described by Kalamiotis was that the discrepancy between the date of registration and the date stated on the mortgage, and the changed dates on the notarial jurats on the acknowledgments and on Hellenic's affidavit of good faith rendered the date of registration uncertain. The date stated on the face of the mortgage, however, is identical to the date declared on the certificate of registration, May 3, 1983. Moreover, Article 197 of the Greek Code of Private Maritime Law provides that "[t]he mortgage begins to exist from the time of the appropriate registration in the records of the place in which the vessel is registered.[14] Consequently, under Greek law, a mortgage does not exist until it is registered and the date on which it is executed or which is stated on its face is therefore irrelevant to the determination of the date of registration. Similarly, even if the acknowledgments and Hellenic's affidavit of good faith were not surplusage under New York and therefore Greek law, the date stated in the notarial jurats is irrelevant to the date of registration. I therefore find no defect in the registration of the mortgage and that the registration is valid.

▊ Accordingly, I conclude that the mortgage is a Greek preferred ship mortgage which was duly and validly executed and recorded in a public register in accordance with the laws of Greece. Thus, the mortgage is a preferred mortgage within the meaning of 46 U.S.C. § 951 and is therefore entitled to treatment as a preferred mortgage lien.

### III. The Priority of Mobil's Lien

Mobil argues that even if the Plaintiffs hold a valid preferred ship mortgage under the Ship Mortgage Act, it is subordinate to

**14.** The language of Article 1268 of the Greek Civil Code, which governs mortgages generally, is substantially similar.

Mobil's lien for supplies provided to the Grigorios. The lien asserted by Mobil is in the amount of $177,735.20 for marine fuel oil and marine gas oil supplied to the Grigorios in Durban, South Africa on November 18, 1983. The evidence presented at trial reflects that: In early November, 1983, a representative of Hellenic called one of Mobil's sales managers in New York inquiring as to Mobil's price for fuel oil in South Africa. Mobil, however, declined to accept Hellenic's order. Thereafter, Pitenis of Hellenic called Curt Townsend, a Vice President of Mobil with responsibility for overseeing certain sales of marine bunkers. Townsend agreed to accept Hellenic's order. Because Mobil had no fuel depot in South Africa, Mobil arranged for Mobil Oil Southern Africa (PTY), Ltd. ("Mobil South Africa"), to supply the Grigorios. Mobil South Africa "assigned and transferred" its claim against the Grigorios to Mobil. Hellenic was then billed by Mobil for the value of the oil, but never paid.

The provision of the Ship Mortgage Act upon which Mobil relies in asserting that its lien is entitled to priority is the last clause of 46 U.S.C. § 951, which provides:

> **Provided, however,** That such 'preferred mortgage lien' in the case of a foreign vessel shall also be subordinate to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States.

Even assuming that Mobil is entitled to a maritime lien for the oil supplied to the Grigorios by Mobil South Africa, that oil was clearly not supplied in the United States. Mobil nevertheless contends that the Plaintiffs' mortgage lien should be subordinated under § 951 because Hellenic arranged to purchase the oil in the United States. In making this argument, Mobil ingeniously characterizes its claim as one arising under a contract that was "performed" in the United States.

■ Section 951, however, makes no reference to contracts. Its plain language is concerned exclusively with the location at which the repairs were performed, or the supplies supplied. Although the brief legislative history of this provision indicates that it was intended to protect American suppliers of goods and services to foreign vessels, there is no clear expression of congressional intent to protect American suppliers supplying vessels outside of the United States. *See,* H.R.Rep. No. 1662, 83d Cong., 2d Sess., 1954 Code Cong. & Ad. News 2451–53. Mobil's interpretation of § 951 would unduly extend the reach of the law of the United States. *Cf. Gulf Trading and Transportation Co. v. M/V Hoegh Shield,* 658 F.2d 363, 366–368 (5th Cir.1981) *cert. denied,* 475 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982) (holding that U.S. law governed creation *vol non* of maritime lien for fuel supplied in Canal Zone even though fuel was ordered in London and delivered under contract negotiated there); *Brandon v. S.S. Denton,* 302 F.2d 404, 411 (5th Cir.1962); (" '[t]he law of the place where the contract is made is, generally speaking, the law of the contract; *i.e.,* it is the law by which the contract is expounded. But the right of priority forms no part of the contract itself' "). Moreover, under the Federal Maritime Lien Act, 46 U.S.C. § 971 *et seq.,* it must be presumed that those who furnish repairs, supplies and other necessaries look to the credit of the vessel and not that of the owner. *Sasportes v. M/V Sol De Copacabana,* 581 F.2d 1204, 1209 (5th Cir.1978). Where a supplier looks to the credit of the vessel to secure his lien, it would be anomalous to consider that the lien attaches in a place other than where the supplies were provided to the vessel. Consequently, because Mobil's claim is not for supplies furnished to the Grigorios in the United States within the meaning of § 951, its claim is not superior to the Plaintiffs' mortgage lien. *See Sasportes v. M/V Sol De Copacabana, supra,* 581 F.2d at 1211 (holding that of those monies advanced to vessel for necessaries, only those advances made in the United States entitled to priority).