In re McLEAN INDUSTRIES,
INC., et al., Debtors.

CHEMICAL BANK, Plaintiff,

v.

UNITED STATES LINES (S.A.), INC.,
Alabama Dry Dock & Shipbuilding and
the United States of America By the
Maritime Administration of the Department of Transportation, Defendants.

Bankruptcy Nos. 86–B–12238 (CB)
through 86–B–12241 (CB).
Adv. Nos. 89–5589A, 89–5590A.

United States Bankruptcy Court,
S.D. New York.

Sept. 27, 1991.

272

See also 132 B.R. 267.

Zalkin, Rodin & Goodman, New York City, by Michael S. Davis, for Chemical Bank.

Milbank, Tweed, Hadley & McCloy by Robert Drain, Gilmartin, Poster & Shafto by Michael C. Lambert, New York City, for United States Lines (S.A.), Inc.

Otto G. Obermaier, U.S. Atty., New York City by Edward A. Smith, for the U.S. of America by the Dept. of Transp.

## DECISION ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT PERTAINING TO ENTITLEMENT TO CERTAIN INSURANCE PROCEEDS

CORNELIUS BLACKSHEAR,
Bankruptcy Judge.

This adversary proceeding ensues from an accident involving the cargo ship Delta Sud (the "Vessel"). Subsequent to the accident, the owner, United States Lines (S.A.), Inc. ("SA" or the "Debtor") filed a petition under chapter 11 of the Bankruptcy Code (the "Code"). Upon approving a settlement between the Debtor and its insurance underwriters over the insurance payment due resulting from the accident, Judge Buschman ordered that the insurance proceeds be paid into an escrow account pending the resolution of the competing claims to the proceeds.[1]

On or about May 17, 1989, SA and Chemical Bank each instituted adversary proceedings against each other and against the United States of America, naming the Department of Transportation, Maritime Administration. By stipulation and order, these adversary proceedings were consolidated. The United States of America filed an answer to Chemical Bank's SA's respective complaints; in each instance seeking reformation of the existing insurance policies and the rights to the insurance proceeds.

At the outset this Court notes that this matter involves some novel legal arguments raising issues of first impression for this Court, this district and this circuit.

### Facts

On January 27, 1983, Chemical Bank ("Chemical") provided a loan and loan commitment to Moore McCormack Lines Incorporated, a predecessor to the Debtor in this case, in the aggregate amount of $50,000,000.00. The loan and loan commitment were evidenced by a Loan Agreement (the "Loan Agreement") dated January 27, 1983. The Loan Agreement was secured by certain collateral including a Preferred Fleet Mortgage (the "Fleet Mortgage") dated January 28, 1983, as amended March 1, 1985, April 1, 1985 and November 1, 1985 (collectively the "Chemical Mortgage").

Pursuant to the Fleet Mortgage, Chemical, as of the date of the filing of this chapter 11 case, had a perfected mortgage lien on certain vessels including the Vessel. In February 1985, S.A. purchased the Vessel and assumed the Vessel's mortgage (the "Whitney Mortgage" or the "MARAD Mortgage"), which was executed in favor of Whitney National Bank of New Orleans ("Whitney"). In addition, the United States of America by the Department of Transportation, Maritime Administration ("MARAD"), executed a contract with Whitney to insure the Vessel's mortgage payments.

When the Debtor defaulted on the Whitney Mortgage, Whitney demanded that MARAD pay the balance of the mortgage which MARAD did. Thus, MARAD was assigned the Whitney Mortgage. Initially MARAD's lien against the Vessel was valued at $3,511,470.00 as of February 12,

---

1. This case was originally assigned to the Honorable Howard C. Buschman, III and subsequently reassigned to this Court.

1987. Since that time the Vessel was sold as scrap in August 1989 and MARAD received $3,052,760.80 as net proceeds of that sale. MARAD had accrued $785,836.71 in interest through the date of the scrap sale and thereafter MARAD accrued $41,436.93 in interest as of March 5, 1990. The balance claimed by MARAD as of March 5, 1990 is $1,285,982.84.

Pursuant to the Chemical Mortgage the Debtor was required to keep the Vessel insured for loss to hull and machinery in order to protect Chemical's interest. The Chemical Mortgage provides as follows:

> Section 1.15. (a) The Shipowner will at all times and at its cost and expense cause to be carried and maintained in respect of the Vessels insurance payable in United States Dollars in such amounts against such risks … in such form (including, without limitation, the form of the loss payable clause and the designation of the named assureds) and with such insurance companies, underwriters … as shall be accepted to the Mortgagee from time to time. In the case of all marine and war risk hull and machinery policies, the Shipowner will cause the Mortgagee to be named as an additional insured.

When the Vessel first became subject to the Chemical Mortgage in 1985, it was insured under insurance coverage arranged by Johnson & Higgins, Inc. ("J & H"). The Debtor had arranged other insurance coverage through its broker Alexander and Alexander of New York, Inc. ("A & A") for several other vessels it owned. On March 31, 1986 the Debtor switched the vessels in the J & H coverage to insurance arranged by A & A. The Debtor instructed A & A to contact J & H for the assured and loss payee clauses and to use the same clauses for Chemical's interest as J & H was then using.

A & A notified Chemical, by a telex sent March 28, 1986 (the "March Telex"), that it was to be insured by the A & A insurance coverage, replacing the J & H coverage. The March Telex specifically informed Chemical that A & A had arranged insurance for the Vessel and stated that the certificates of insurance would follow.[2]

After the March Telex, A & A received assured and loss payee clauses from J & H which were apparently outdated and did not list Chemical as either an assured or loss payee with respect to the Vessel. Using the inaccurate clauses, A & A prepared several documents including the certificates of insurance (the "May Certificates") sent by A & A to Chemical on May 24, 1986.

The May Certificates were for hull and machinery coverage and additional value coverage. While these May Certificates did name Chemical as an assured and loss payee as to several other ships, they neglected to identify Chemical as an assured or loss payee with respect to the Vessel. Shortly after receipt of the May Certificates, Chemical objected to the failure to name it as assured and loss payee with respect to the Vessel. Chemical then exercised its contractual right to approve any loss payee clauses and supplied A & A with revised clauses.

In response to the objection by Chemical, A & A issued replacement insurance certificates (the "June Certificates") containing the revised loss payee and assured clauses. The new June Certificates provided that the insurance proceeds be paid to the mortgagee as follows:

> All policies of insurance under this Section shall … provide that, so long as any Bonds are outstanding, payment of all losses in excess of $250,000 by all insurance Underwriters with respect to any one accident, occurrence, or event shall be made to the Mortgagee.

---

**2.** The A & A insurance coverage was underwritten by underwriters in London, who bore 60% of the risk, by underwriters in Norway who bore 9.5% of the risk and by other underwriters in the United States who accepted the remainder of the risk. The United States underwriters and the Norwegian underwriters agreed to a "Full Following London Clause." In effect the United States and Norwegian underwriters were obligated to follow the insurance policies issued by the London underwriters, so that all policies would be identical.

In addition the June Certificates contained a clause naming the following as "assureds":

United States Lines (S.A.), as owner, Whitney National Bank of New Orleans, as Trustee/Mortgagee, Chemical Bank as Second Preferred Mortgagee, and The United States of America.

But the error in the insurance coverage was not fully rectified. On May 9, 1986, A & A's London affiliate, Price Forbes, presented to other London underwriters a "slip" (the "May Slip") which attached the same incorrect assured and loss payee clauses as had been attached to the May Certificates. When A & A issued the replacement June Certificates, A & A failed to instruct Price Forbes to change the May Slip. Accordingly, the London underwriters were never informed of the error and attempted correction.

On July 19, 1986, the Vessel sustained extensive damage while being towed. The Debtor filed a claim with the underwriters of A & A for this damage in the amount of $7,187,524.00. This claim was settled for $6,500,000.00. Under the terms of the settlement with the underwriters, the Debtor was permitted to retain the Vessel for whatever salvage value she had. The Vessel was later sold in August 1989 for $3,336,122.00.

In September 1986, the London underwriters issued insurance policies (the "September Policies"). Because A & A did not provide the London underwriters with the June Certificates, which replaced the May Certificates, the September Policies did not include the revised loss payee and assured clauses.

The Debtor now asserts that because Chemical was not named in the September Policies as either loss payee or assured, Chemical is not entitled to any portion of the insurance proceeds. Additionally, the Debtor argues that because the damage to the Vessel was settled on a non-total basis, the Debtor was not obligated to turnover to Chemical the insurance proceeds. In rebuttal Chemical asserts that the September Policies should be reformed to include the revised loss payee and assured clauses because the failure to use these clauses was merely a mistake. Alternatively, Chemical claims that its perfected security interest in the Vessel extends to the insurance proceeds by application of the Uniform Commercial Code. Chemical commenced this adversary proceeding as a secured creditor of the Debtor to recover the entire amount of the insurance proceeds minus the amount which MARAD is entitled to as the first mortgagee.[3]

## DISCUSSION

### A. *Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to bankruptcy adversary proceedings by Bankruptcy Rule 7056, provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the standard for ruling on a summary judgment is similar to that of a directed verdict if under governing law there can be but one reasonable conclusion. In addition the Supreme Court noted, in *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48, 106 S.Ct 2505, 2510, 91 L.Ed.2d 202 (1986), that "the mere existence of some alleged factual dispute between the parties *will not* defeat an otherwise properly supported motion for summary judgement; the requirement is that there be no genuine issue as to any material fact." *Id.* (emphasis added.) Material facts have been defined as those whose resolution will be determinative of the outcome. *See also Pereira v. Hong Kong &*

---

3. In addition the other defendant in this adversary, Alabama Dry Dock & Shipbuilding Corp. ("ADDSCO") by a stipulation dated May 14, 1990, signed by the Hon. Howard Buschman on May 29, 1990, and docketed May 30, 1990, withdrew, with prejudice, their claim to any insurance proceeds.

*Shanghai Banking Corp. (In re Kam Kuo Seafood Corp.),* 76 B.R. 297, 300 (Bankr. S.D.N.Y.1987).

The pleadings and accompanying documents filed in connection with the instant motions establish that no genuine dispute exists as to any material facts set forth in the parties' respective local rule 13(h) statements. Rather the facts asserted by the parties are substantially similar and based on documents submitted. To the extent that there are facts in dispute, summary judgment is not defeated because these disputes do not involve "material issues of fact." *Id.* at 300. *Accord Shaw v. Jamaica Savings Bank (In re Cohen),* 63 B.R. 104, 106 (Bankr.E.D.N.Y.1986).

■ There is a dispute concerning the proper interpretation of the revised loss payee clause supplied by Chemical to A & A. The revised loss payee clause did not specifically mention Chemical as loss payee; rather, it only names the "mortgagee" as the loss payee. The Debtor argues that, even if included in the September Policies, the revised loss payee clause actually forecloses Chemical's claim to the insurance proceeds. However, the interpretation of the revised loss payee clause is an *issue of law not fact. See generally Thornton v. Bean Contracting Co.,* 592 F.2d 1287, 1290 (5th Cir.1979) (emphasis added) ("the interpretation of contract is a question of law, not fact, and appellate review is not limited to the 'clearly erroneous rule.'") Therefore, this will not defeat the parties' respective summary judgment motions because it is not a material *factual* dispute.

B. *Reformation*

■ The starting point for this Court is to consider whether, in light of the foregoing facts, the September Policies should be reformed to include the revised loss payee and assured clauses. The Debtor claims that the existing insurance policies are controlling because they reflect the coverage which the London underwriters had reason to believe was correct at the time the policies were issued. Additionally, the Debtor posits that because there was

no mutual mistake by Chemical and the Debtor, reformation is inappropriate absent a showing of fraudulent misrepresentation on the part of the Debtor.

The well established principal under New York law is that "a court may reform a contract 'to restate the intended terms of the agreement when the writing that memorializes that agreement is at variance with the intent of both parties.'" *Westchester Resco Co., L.P. v. New England Reinsurance Corp.,* 648 F.Supp. 842, 846 (S.D.N.Y.1986), *aff'd,* 818 F.2d 2 (2d Cir. 1987), *quoting George Backer Management v. Acme Quilting Co.,* 46 N.Y.2d 211, 219, 413 N.Y.S.2d 135, 139, 385 N.E.2d 1062, 1066 (1978). Thus the fact that the September Policies issued by the London underwriters failed to name Chemical or MARAD as either loss payee or assured is not necessarily controlling if, in fact, that runs contrary to the intent of the parties. The Debtor concedes that it instructed A & A to include in the insurance policies the revised loss payee and assured clauses supplied by Chemical. Through A & A's error, however, the proper clauses never reached the London broker and accordingly the September Policies directed payment of insurance proceeds only to the Debtor. (*See* Candilora Dep. at 78, in which Mr. Candilora stated that "the intent of all the policies was to have the correct [loss payee clauses] in there."); *American General Fire & Casualty Co. v. Reese,* 853 F.2d 370, 374 (5th Cir.1988).

In fact, when Chemical learned that it was not named in the original loss payee clause, A & A and the Debtor were immediately made aware of this error. Pursuant to notification by Chemical, A & A, after discussions with the Debtor, incorporated the revised loss payee and assured clauses in the June Certificates thereby acknowledging the error originally made. Since the Debtor did not object to the incorporation of these clauses in the insurance policies, "[A & A] included it virtually verbatim in the revised Certificates of Insurance." Debtor's Memorandum of Law at 14.

The Debtor argues that the revised loss payee and assured clauses only demonstrate the intentions of the parties to protect MARAD's interest in the proceeds and not Chemical's since Chemical was not specifically named a loss payee. However, notwithstanding this fact, the intent to name Chemical as an additional insured in the insurance policy is clear and controlling. In *Crivella v. Transit Casualty Co.*, 116 A.D.2d 1007, 498 N.Y.S.2d 627 (4th Dept.1986), a fire insurance policy erroneously named the sublessee as owner of the premises. The sublease promised to insure the contents of the premises naming the owner and lessee as loss payees. After a fire destroyed the premises, the court directed that the policy be reformed to name the true owner and lessee as additional insureds. The court specifically noted that " 'the name of the insured in the policy is not always important if the intent to cover the risk is clear.' " 116 A.D.2d at 1008, 498 N.Y.S.2d at 628 (*quoting Matter of Lipschitz v. Hotel Charles*, 226 A.D. 839, 840, 234 N.Y.S. 513, *aff'd* 252 N.Y. 518, 170 N.E. 127); *see also Court Tobacco Stores Inc. v. Great Eastern Ins. Co.*, 43 A.D.2d 561, 349 N.Y.S.2d 8, 10 (2d Dept. 1973). *But see Leavitt–Berner Tanning Corp. v. American Home Assurance Co.*, 129 A.D.2d 199, 516 N.Y.S.2d 992 (3d Dept. 1987).[4]

The Chemical Mortgage unequivocally states that "in the case of all maritime and war risk hull and machinery [insurance] policies, the Shipowner will cause the Mortgagee to be named additional insured." Chemical Mortgage § 1.15. Clearly, Chemical was named an additional assured in the revised assured clause. By being named as an additional assured, the parties clearly intended for Chemical to be a party to the insurance coverage and entitled to the benefits thereunder. *See* 4 Ruda, *Asset Based Financing* § 36.04[6] at 36–24 ("By becoming a named assured, the lender becomes a party to the insurance contract."); *Atlantic Lines Ltd. v. American Motorists Ins. Co.*, 547 F.2d 11, 13 (2d Cir.1976) (in construing the language of a contract, such as a policy of insurance, the standard is what a reasonable person would have understood it to mean in its actual setting).

The Second Circuit has acknowledged that where the intentions of parties are clear, the court will not elevate form over substance and allow a windfall to a party. In *Prudential Ins. Co. v. S.S. American Lancer*, 870 F.2d 867 (2d Cir.1989), a mortgagee sought foreclosure of a first preferred ship mortgage. The Second Circuit held that the first preferred ship mortgage was valid for the amount that the mortgagee and the debtor originally intended, not the amount erroneously recorded on the mortgage amendment. The court noted that "[i]f the typographical error reduces Prudential's preference by some $ 92 million, however [the debtor] will be the beneficiary of a major windfall. We know of no general principle of law or equity that would in any way support what is so obviously an unjust result." *Id.* at 871. This Court, like the court in *Prudential,* is faced with a debtor seeking to benefit from a windfall. Equity dictates that the September Policies be reformed to incorporate the revised loss payee and assured clauses to be made effective as of a date prior to the accident. *Fireman's Fund Amer. Ins. Co. v. Ken–Lori Knits, Inc.*, 399 F.Supp. 286, 290–91 (E.D.N.Y.1975) ("The cumulative effect makes clear the intention of the parties that [the creditor] have the status of a secured creditor with regard to the insurance proceeds ... for whose benefit the insurance was procured.")

By incorporating the revised loss payee clause in the September Policies, MARAD's interest in the proceeds as loss payee is undisputed.

■ By reforming the September Policies to include the revised loss payee and

---

4. In *Leavitt–Berner* a mortgagee sued an insurance agency claiming that the mortgagee should have been named in the loss payee clauses of the insurance. The court held that the "mortgagee ... was not entitled to reformation of policies to designate mortgagee as loss payee, where ... policies clearly designated the mortgagee as mortgagee and not loss payee." *Id.* In addition the court noted that there was no indication that the parties intended to benefit the mortgagee.

assured clauses, Chemical's status as an assured is secured. However, the Debtor believes that even if the revised loss payee and assured clauses secure Chemical's status as an assured, Chemical is nevertheless not entitled to the insurance proceeds because as an assured, Chemical merely has the right to be defended by the insurance underwriters if a suit arose involving the Vessel.

■ An assured, however, is not merely a party with a limited interest, but more often the party for whose benefit the insurance was procured. Ideally, Chemical should have unequivocally provided that it be named loss payee as well as assured. However, the fact that Chemical failed to do this will not work to defeat its rights and interests. One commentator noted that "[t]he nature of the mortgagee's interest need not be specified in the marine policy, and usually his interest is covered by naming the mortgagee as an additional assured or by including the mortgagee in policy loss payee provisions, or by both means." [5] The Chemical Mortgage clearly provides that "[t]he Shipowner will at all times and at its own cost and expense cause to be carried and maintained in respect of the Vessels insurance ... [i]n the case of all marine and war risk hull and machinery policies, the Shipowner will cause the Mortgagee to be named as an additional insured." Chemical Mortgage § 1.15(a). In addition, the Chemical Mortgage provides that if the Debtor lapses in premium payments, "the Shipowner will cause each insurance company ... with respect to all insurance required hereby to agree in writing for the *benefit of Chemical* "that each policy ... shall not lapse ... without five (5) days ... notice to [Chemical]...." Chemical Mortgage § 1.15(a). Thus if the Debtor fell behind in premium payments, Chemical could make the late payments and assure that the insurance on the Vessel not lapse. Clearly, the insurance procured by the Debtor was intended to benefit both MARAD and Chemical.

*See generally* 5 Couch, *Cyclopedia of Insurance Law,* § 29:64 at 341–43 (1985 & Supp.1990) (hereinafter *Couch on Insurance* ) ("The mortgagee has no interest in the proceeds unless he is named in some way in the contract of insurance or *in the mortgage as being entitled to the proceeds of insurance,* or unless the policy has been assigned to him, or the mortgagor has agreed with him that he is entitled to the proceeds, or *the mortgagor agreed to procure insurance for his [the mortgagee's] benefit.")* (emphasis added). By attaining the status of additional assured, Chemical was guaranteed that it would receive the benefit of the insurance coverage.

### C. Total Loss or Non–Total Loss

■ The Debtor posits a novel argument that even if reformation is achieved and the revised loss payee and assured clauses are incorporated in the September Policies, Chemical, as an additional assured, would not be entitled to the insurance proceeds because the loss to the Vessel was on a less than total basis. In other words, the Debtor asserts that if the settlement on the Vessel was on a less than total basis, the insurance proceeds were to be paid to the mortgagee of the first preferred fleet mortgagee only—MARAD—and the remaining proceeds would then be forwarded to the Debtor. But the revised clause is to the contrary. The revised loss payee clause states that "in the event that insurance becomes payable under said policies on account of an accident, occurrence or event not resulting in an actual or constructive total loss or an agreed or compromised total loss of the vessel, the Mortgagee shall ... if there is an existing default which shall have continued for 30 days, apply the insurance as provided in Section 4.06 or Section 5.02 [of the MARAD Mortgage] whichever is applicable." There is no dispute that the Debtor was in default for more than 30 days.

**5.** In addition the author noted that "when an individual or firm becomes an additional assured in a marine insurance contract, he ... receives the benefit of the protection provided therein." Mack, *The Hull Policy: Additional Assured; Loss Payees; Waiver of Subrogation; The Mortgagee's Position; Premiums, Deductibles and Franchises.,* 41 Tul.L.Rev. 381 (1967).

Section 4.06 provides for the distribution of proceeds in the following fashion:

First—To the payment of all advances by the Mortgagee pursuant to the Mortgage and all reasonable charges and expenses of the Mortgagee;

Second—To the payment of the whole amount then due and unpaid upon the Outstanding Bonds (and in case such remaining moneys are insufficient to pay said whole amount then due and unpaid, then to the payment of the due and unpaid principal of and interest [and premium, if any on such Outstanding Bonds (including interest on overdue principal to the extent provided in the Bonds), ratably according to the aggregate amounts so due and unpaid on the respective dates fixed by the Mortgagee for distribution of such moneys); provided that such payments shall be made only upon presentation of the respective Bonds and stamping thereon the amount paid if only partly paid, or upon surrender and cancellation thereof if fully paid; and

Third—Any remaining moneys shall be paid to the Shipowner *or to whosoever shall be lawfully entitled thereto.*

Section 5.02, titled "Rights of Secretary after Assignment of Mortgage", provides the following:

After the Mortgage shall have been assigned to the United States in accordance with the Insurance Contract—

(a) The provisions of Section 4.06 shall be void and of no effect to the extent said provisions are in conflict with Article V of the Insurance Contract; and

(b) The corporation, which was the Mortgagee immediately prior to such assignment, the Secretary and the Shipowner shall respectively, have the rights provided in Article V of the Insurance Contract.[6]

■ The plain meaning of the revised loss payee clause provides that in the event

of non-total losses, the insurance proceeds are payable first to MARAD to the extent of its interest, but then to "whosoever shall be lawfully entitled thereto." MARAD Mortgage § 4.06. It has been noted that "[b]y becoming a named assured, the lender becomes a party to the insurance contract, *a status that may be higher than that of a loss payee.*" 4 Ruda, *Asset Based Financing: A Transactional Guide*, § 36.04[6] at 36-24 (emphasis added.) As an assured, Chemical is, at the very least, "lawfully entitled" to the benefits of the insurance proceeds as if it were named as loss payee. Therefore, Chemical falls within the "whosoever shall be lawfully entitled thereto" language in the revised loss payee clause.

Moreover, the Chemical Mortgage contemplated that in the event of a non-total loss, Chemical would be entitled to any insurance proceeds but that it could forego this right if it chose to. The Chemical Mortgage states that in the case of non-total losses the payment of insurance proceeds is to the "mortgagee, who *may* direct payment to the shipowner to reimburse it for expenses incurred." Chemical Mortgage § 1.15(c).

Furthermore, if the settlement on the Vessel was on a total loss basis, then the revised loss payee clause clearly states that "insurance hereunder shall be payable to the Secretary for distribution to himself and then to others, as their interests may appear." Thus, in the event of a total loss, all monies would have been paid to the Secretary directly, who in turn would satisfy the interests of the United States first and then the *other* beneficiaries of the insurance which includes Chemical. Both MARAD, as the first lienholder, and Chemical, as the second lienholder, are entitled to share in the distribution of the insurance proceeds since that is the respective *order* of their interests.

If this Court had decided not to reform the September Policies to include the re-

---

6. The "Insurance Contract" referred to above is the "Contract of Insurance of Mortgage Between the United States of America and Whitney National Bank of New Orleans, Trustee." Article V referenced therein provides that the Secretary

shall satisfy the interests of the United States first and to "promptly pay or otherwise account therefor to the Mortgagor or other party in interest as he may deem proper."

vised loss payee and assured clauses and instead relied solely on the Chemical Mortgage, the result would be the same in a total loss situation. Section 1.15(i) of the Chemical Mortgage states that "with respect to insurance, all provisions requiring payments of insurance proceeds to the Mortgagee shall apply only after all payments required to be made to the respective Prior Mortgagee have been made." The Chemical Mortgage adds, in § 1.15(d), that "[i]n the event of an actual ... total loss ... all insurance or other payments for such shall be paid to the Mortgagee." Chemical, as the mortgagee, would clearly be entitled to share in the insurance proceeds.

In sum, whether the damage to the Vessel was settled on a total or non-total loss basis need not be determined because in either scenario the insurance proceeds are payable to MARAD, as the first preferred mortgagee, and then to Chemical, as the second preferred mortgagee, under the revised loss payee clause and/or the Chemical Mortgage. *See also* Lord, *The Hull Policy: Actual and Constructive Total Loss and Abandonment,* 41 Tul.L.Rev. 347, 351–52 (1967).

### D. *Article 9 of the U.C.C.*

■ Although this Court's analysis could end here, this Court will consider the Uniform Commercial Code arguments. This Court believes that the Uniform Commercial Code further supports Chemical's and MARAD's rights to the insurance proceeds. The issue is whether the Uniform Commercial Code is applicable to a security interest perfected under the Ship Mortgage Act of 1920 (the "Ship Mortgage Act") where the Ship Mortgage Act is silent as to whether such security interest extends to insurance proceeds realized as a result of damage to

a collateral vessel. The Debtor in the case *sub judice,* argues that Article 9 of the New York Commercial Code[7] (the "N.Y.U.C.C.") does not apply to the order of entitlement to the insurance proceeds because the agreements between the parties are governed expressly by the Ship Mortgage Act. The Debtor argues that the Ship Mortgage Act, under which the MARAD and Chemical Mortgages were duly recorded and executed, has no provision expressly dealing with the rights of a mortgage holder to insurance proceeds and Chemical and MARAD cannot assert any rights to those proceeds under the N.Y.U.C.C. greater than what is offered under the Ship Mortgage Act. *See generally* 46 U.S.C. § 911 et seq. (1988) (repealed January 1, 1989, but which does not affect the mortgages in this case). The Debtor argues that the Ship Mortgage Act purports to deal with security interests in specific types of vessels, which term is defined to mean physical watercraft only, and thereby excludes a mortgagee's rights to insurance proceeds. The Debtor references specific language from the Chemical Mortgage which states that it covers only the physical watercrafts within the meaning of the Ship Mortgage Act.[8]

Section 9–104(a) provides that Article 9 does not apply to "a security interest subject to any statute of the United States to the extent that such statute governs the rights of the parties to ... transactions in particular types of property." N.Y.U.C.C. § 9–104(a). Accordingly, the Debtor argues that since the mortgages are governed by the Ship Mortgage Act, the N.Y.U.C.C. does not apply. The Debtor also argues that if this Court needs to direct inquiry elsewhere, it should turn to federal maritime common law.

---

7. Because the Debtor maintains an office in New York, the Vessel's home port is New York, Chemical's principal office is located in New York and the loan agreement between the Debtor and Chemical specifically references New York law in § 22(i), New York law is applicable. *See generally, Woodling v. Garrett Corp.,* 813 F.2d 543 (2d Cir.1987).

8. As an alternative argument the Debtor asserts that to the extent the Chemical Mortgage covered "other property", such claims could be settled by a payment of .01% of the claim. Accordingly, the Debtor asserts that insurance proceeds would fall within the ambit of "other property" which the Debtor can settle by paying one percent of the value. That is not addressed here in light of this Court's holdings.

Official comment 1 to § 9–104 explains the purpose and reasoning for excluding certain types of security agreements from its coverage: "Where a federal statute regulates the incidents of security interests in particular types of property, those security interests are of course governed by the federal statute and excluded from this article. The Ship Mortgage Act of 1920 is an example of such a federal act." But the commentator also recognized that such a broad statement is not without qualification:

> Even such a statute as the Ship Mortgage Act is far from a comprehensive regulation of all aspects of ship mortgage financing. That Act contains provisions on formal requisites, on recordation and on foreclosure but not much more. If problems arise under a ship mortgage which are *not* covered by the Act, the federal [ ] court must decide whether to improvise an answer under federal law or to follow the law of some state with which the mortgage transaction has appropriate contacts. *The exclusionary language in paragraph (a) is that this Article does not apply to such security interest "to the extent" that the federal statute governs the rights of the parties. Thus, if the federal statute contained no relevant provision this Article could be looked to for an answer.*

N.Y.U.C.C. § 9–104, official comment 1 (emphasis added).

Since the Ship Mortgage Act does not address the issue of entitlement to insurance proceeds, this Court must look to the New York Uniform Commercial Code for guidance. The Supreme Court noted in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 717, 99 S.Ct. 1448, 1452, 59 L.Ed.2d 711 (1979), that when a national rule is unnecessary to protect federal interests, "the prudent course is to adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation." *Id.; See also Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 316, 75 S.Ct. 368, 372, 99 L.Ed. 337 (1955) (the control of all types of

insurance companies and contracts has been primarily a state function since the States came into being).

■ Pursuant to N.Y.U.C.C. § 9–302(3) and (4), the filing of a financing statement otherwise required by Article 9 is *not necessary* or effective to perfect a security interest in property subject to "(a) a statute or treaty of the United States which provides for a national registration." N.Y.U.C.C. § 9–302(3) & (4). Additionally, compliance with a statute or treaty is "equivalent to the filing of a financing statement under this Article, and a security interest in property subject to the statute or treaty can be perfected only by compliance therewith." *See* N.Y.U.C.C. § 9–302(4). Both MARAD and Chemical have complied with the registration and perfection requirements of the Ship Mortgage Act.[9] Consequently, both hold perfected security interests in the Vessel which are recognized under the N.Y.U.C.C.

■ The N.Y.U.C.C. provides instructions for the disposition of insurance proceeds to secured parties. Courts have agreed that insurance payable by reason of loss to the collateral constitutes proceeds covered by the N.Y.U.C.C. Section 9–306 provides that if a creditor holds a perfected security interest in property, that creditor also holds a perfected security interest in the proceeds of that collateral:

> (1) Proceeds includes whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds ...
> (2) ... a security interest continues in collateral.

N.Y.U.C.C. § 9–306 (McKinney 1984). *Sanchez v. Dept. of Treasury*, 696 F.2d 213 (2d Cir.1982) (the circuit court, in applying New York law, held that pre–1978 insurance benefits were not covered by the U.C.C. but post–1978 insurance benefits were proceeds under the revised Article 9 § 306(1)); *Brown v. First Natl. Bank*, 617 F.2d 581 (10th Cir.1980); *PPG Indus. Inc.*,

**9.** The Debtor does not contest this fact.

ient**283**

*v. Hartford Fire Insur. Co.*, 531 F.2d 58 (2d Cir.1976) (the court held that the failure on the part of the debtor to insure the collateral which was destroyed by fire, rendered the debtor's insurance claim "proceeds" under the U.C.C.); *Paskow v. Calvert Fire Ins. Co.*, 579 F.2d 949, 954 (5th Cir.1978). Therefore, both MARAD's and Chemical's perfected secruity interests in the Vessel extends to the insurance proceeds.

This Court's resort should not be surprising since courts have traditionally applied the Uniform Commercial Code to fill gaps in federal statutes. *See Personal Jet Inc. v. Callihan*, 624 F.2d 562 (5th Cir.1980) (Article 9 applied to fill void in Federal Aviation Act); *Morgan Guaranty Trust Co. v. M/V Grigorios C. IV*, 615 F.Supp. 1444, 1451 (E.D.La.1985) (the court looked to the N.Y.U.C.C. to fill the gap in the Ship Mortgage Act.)

█ The Debtor alternatively argues that even if the N.Y.U.C.C. is applicable, Chemical's and MARAD's security interests in the Vessel do not vest in the insurance proceeds without affirmative steps by the parties to assure secured status. This is not true. First, disregarding Article 9 momentarily, Chemical and MARAD did indeed take affirmative steps to guarantee their interests in the insurance proceeds. Both parties, relied on assurances made by the Debtor and A & A that the insurance policies would contain the correct revised loss payee and assured clauses. But through the error of A & A, the clauses never reached the London underwriters. Chemical and MARAD did not learn that their interests were not protected in the insurance policies, nor did they have reason to believe so, until after the damage to the Vessel. In light of these circumstances, Chemical and MARAD did all that they possibly could to secure their respective positions. Any argument by the Debtor that Chemical and MARAD did not take affirmative action to protect their interests is disingenuous.

█ Second, returning to Article 9, section 9–306(3) clearly demonstrates that a creditor's security interest in collateral continues in proceeds until ten days after the proceeds are fully converted to cash. Section 9–306(3) states the following:

> The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless
>
> \*   \*   \*   \*   \*   \*
>
> (3) a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds.

N.Y.U.C.C. § 9–306 (McKinney 1984).

Chemical and MARAD, having filed such financing statements under the Ship Mortgage Act, are protected under the N.Y.U.C.C. *See* N.Y.U.C.C. § 9–312(6) official comment 8. Subsection (6) to official comment 8 of § 9.312(6) provides that the filing as to original collateral determines the date of filing as to proceeds thereof. This rule implies, of course, that the filing as to the original collateral is effective as to proceeds under section 9–306(3). Additionally, the proceeds are clearly identifiable since they remain in escrow. Accordingly, Chemical's and MARAD's perfected security interest as to the Vessel, runs to the insurance proceeds of the Vessel.

█ The Debtor also asserts that since at the commencement of the Debtor's chapter 11 case there were no proceeds in existence, the proceeds represent after acquired property which, pursuant to § 552 of the Code, the Debtor can claim free and clear of any prepetition liens.

█ Generally, section 552 provides that after-acquired property of the estate is not subject to any lien resulting from any security agreement entered into by a debtor prior to the commencement of the bankruptcy case. *See Collier on Bankruptcy* ¶ 552.01 at 552–1–4 (15th ed. 1986) But this general rule is limited by the exceptions found in section 552(b) which allows a prepetition security agreement to extend to proceeds when the security agreement and non-bankruptcy law so provide. This rule is subject to further limitation by the eq-

uitable powers of the bankruptcy court which may "after notice and hearing and based on the equities of the case, order ... otherwise." 11 U.S.C. § 552(b). "[However], if nonbankruptcy law covers proceeds, it is not necessary that the security agreement do so." *Collier on Bankruptcy, supra,* ¶ 552.02. Accordingly, since their financing statements covers proceeds, under the N.Y.U.C.C., Chemical's and MARAD's security interests in the insurance proceeds remain intact even though the proceeds came into existence after the commencement of the bankruptcy case. Section 552 does not apply in this context.

■ In addition, § 9–306 clearly defines proceeds as "insurance payable by reason of loss of damage to the collateral ..." not merely insurance paid at the time of the commencement of the case. The intent of § 9–306 to cover "insurance proceeds" cannot be defeated merely because the insurance proceeds did not exist when the Debtor filed its chapter 11 petition. *See PPG Indus., Inc. v. Hartford Fire Ins. Co.,* 531 F.2d 58 (2d Cir.1976) (the insurance proceeds became proceeds on the date of the damage to the collateral).

■ In *PPG Indus.* the Second Circuit analyzed the "actual existence" requirement of the Internal Revenue Code and concluded that the "subject matter of the security agreement was clearly in existence and ... [therefore] the proceeds of the insurance are merely the collateral in another form." *Id.* at 62. As in *PPG*, Chemical's and MARAD's Mortgages represented security interests in the Vessel and when the Vessel was replaced by the insurance proceeds their security interests continued in the proceeds even though the proceeds did not exist at the commencement of the bankruptcy case. "If anything, the 'existence' requirement is satisfied by the existence of an available insurance policy." *Id.* at 62.

■ Moreover, the Debtor fails to realize that insurance proceeds, when specifically assigned by a debtor *cannot* be reclaimed by the debtor. In *In re Moskowitz,* 14 B.R. 677, 680–81 (Bankr. S.D.N.Y.1981) the court held that "in view

of assignment made by the Debtors ... of insurance proceeds, those proceeds *were not* property of the estate ... and payment ... was not a voidable preference." (emphasis added.) In *Moskowitz* the Debtor sought to recover funds paid by the insurer to the hospital for services rendered three months prior to the filing of the petition. The court concluded that "[a]11 that is required is that the property must be sufficiently identifiable and there must be an intent to assign a present right in the subject matter of the assignment, divesting the assignor of all control over that which is assigned." *Id.* at 681. *See also Authorized Credit Corp. v. Enterprise Indus. Co.,* 109 N.Y.S.2d 687 (1951). In addition, the *Moskowitz* court noted that "if the facts reveal that the Debtors previously assigned the insurance proceeds to [another entity] then, of course, any payment to the Debtors might be held by them in a fiduciary capacity under a constructive trust so as *not to constitute property of the estate." In re Moskowitz,* 14 B.R. at 680 (emphasis added). *See generally Gamble v. Mathias,* 61 F.2d 911 (5th Cir.1932); *In re Summer,* 35 F.2d 930 (E.D.N.Y.1928).

In the case *sub judice,* the revised loss payee clause assigned the insurance proceeds to MARAD as a loss payee and Chemical as an additional assured. *Schleimer v. Empire Mutual Ins. Co.,* 71 Misc.2d 1014, 1015, 337 N.Y.S.2d 872, 873 (1st Dept.1972) ("[a] party designated [as loss payee] has generally been considered to be a mere appointee with the right to receive the proceeds of the loss *to the extent of his interest."*) (emphasis added). The insurance proceeds, therefore, are not property of the Debtor's estate. *Bucon, Inc., v. Pennsylvania Mfg. Ass'n Ins. Co.,* 151 A.D.2d 207, 210, 547 N.Y.S.2d 925, 927 (3d Dept.1989) ("[t]he certificate of insurance naming plaintiff as an additional insured is evidence of ... [an] agreement to provide plaintiff coverage."); *Yonkers Bd. of Educ. v. Richmond Children's Center Inc.,* 58 B.R. 980, 981 (S.D.N.Y.1986) (constructive trust, determined in accordance with state law, is not part of debtor's estate).

■ Lastly, the Debtor contends that interests in the insurance proceeds which even if the N.Y.U.C.C. does apply, Chemical does not have a right to the insurance proceeds because, under § 9–203(3), Chemical "otherwise agreed". Specifically, the Debtor argues that § 9–203(3) provides that the parties to a security agreement may agree to terms and rights different from those provided under § 9–203(3). By naming MARAD as the only loss payee in the revised loss payee clause, the Debtor concludes that Chemical otherwise agreed to pay a party not privy to the Chemical Mortgage. But the facts in this case prove that Chemical did not otherwise agree. Rather Chemical made continuous efforts to secure its interest in the insurance proceeds. This Court believes that the N.Y.U.C.C. contemplates *an agreement by the parties not to seek any rights to the proceeds,* and clearly Chemical was not willing and did not intend to relinquish its interest in the insurance proceeds. *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 n. 2 (2d Cir.1983) (intention of the parties is the first tool of construction); *Payroll Express Corp. v. Aetna Casualty & Surety Co.,* 659 F.2d 285, 295 (2d Cir.1981) (the intention of the parties, if discernible, governs); *McGrail v. Equitable Life Assur. Soc.,* 292 N.Y. 419, 424–25, 55 N.E.2d 483 (1944).

### E. *Equitable Lien*

■ The equitable lien theory is not applicable in this case because, as articulated above, Chemical and MARAD have perfected security interests in the Vessel which continue in the insurance proceeds. The Debtor cites numerous cases for the proposition that a debtor in possession, as a hypothetical lien holder, can defeat an equitable lien. Those cases are distinguishable insofar as they involved creditors with unperfected liens. *See Hassett v. Revlon Inc., (In re O.P.M. Leasing Services),* 23 B.R. 104 (Bankr.S.D.N.Y.1982); *Michigan Fire & Marine Ins. Co. v. Genie Craft Corp.,* 224 F.Supp. 636 (D.Md.1964). In contrast, in this case, applying the rationale of Article 9 of the N.Y.U.C.C., both MARAD and Chemical have perfected security interests in the insurance proceeds which cannot be avoided by the Debtor.

### F. *Constructive Trust*

■ As with the equitable lien theory, the constructive trust theory posited by the Debtor need not be reached. However, consistent with this Court's approach so far, the constructive trust theory will be explored for the sake of thoroughness.

Had this Court decided not to reform the September Policies, Chemical and MARAD urged a finding that the insurance proceeds were held in constructive trust for their benefit. Since the remedy of a constructive trust is equitable in nature, this Court proceeds with caution in deciding whether the facts support the imposition of a constructive trust. The law of a constructive trust has been summarized by one commentator as follows:

> Where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched.... This unjust enrichment may arise out of wrongful acquisition of the title to property.... A constructive trust may arise, however, even though the acquisition of the property was not wrongful. Thus a constructive trust arises where the title to property is acquired through a mistake.

5 *Scott on Trusts* § 462.

It is critical that said enrichment be unjust "under the circumstances and as between the two parties to the transaction." *Schwartz & Weiss P.C. v. Branch Motor Express Co. (In re Branch Motor Express Co.),* 51 B.R. 146, 149 (Bankr. S.D.N.Y.1985). While this Court is reluctant to use its equitable power to impose a constructive trust on the insurance proceeds, the facts of this case would have compelled that a constructive trust be imposed in favor of Chemical and MARAD had the September Policies not been reformed.

In *Sanyo Electric, Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.),* 874 F.2d 88 (2d Cir.1989), the court impressed a constructive trust on inventory

located in New Jersey in favor of a secured creditor who had only perfected his security interest in New York. The secured creditor in *Howard's Appliance* failed to perfect his security interest in New Jersey because the debtor, in disregard of its obligation, failed to keep the inventory in New York. In addition the court noted that "property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under [§ 541] ... only to the extent of the debtor's legal title to such property, *but not* to the extent of any equitable interest in such property that the debtor does not hold." *Id.* (emphasis added.) In the instant case, the Debtor asserts that the September Policies named the Debtor as payee thereby giving the Debtor a claim to legal title. But the facts and circumstances surrounding procurement of insurance make clear that all parties intended to secure Chemical's and MARAD's equitable interest in the insurance proceeds and accordingly a constructive trust is the proper remedy. *See Couch on Insurance*, § 29:64 at 343.

The New York Court of Appeals in *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121, 386 N.Y.S.2d 72, 75, 351 N.E.2d 721, 724 (1976) identified the four traditional elements of a constructive trust: (1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment. These elements exist in the instant case.

The relationship between Chemical, MARAD and the Debtor can be characterized as a fiduciary or confidential one. Both Chemical and MARAD relied on the assurances made by the Debtor in granting the mortgage that they would be named as beneficiaries of the insurance. One thing that is clear is that the Debtor represented to Chemical and MARAD all along that their respective interests in the insurance

proceeds would remain consistent with their interests as provided by the J & H insurance. But that did not happen.

■ Although the Debtor could argue that its actions did not cause the harm, but rather it was A & A's error, the lack of one of the four factors will not necessarily defeat a constructive trust. *See United States v. Rivieccio*, 661 F.Supp. 281, 292 (E.D.N.Y.1987) ("the four elements ... are not talismanic"); *Cherno v. Dutch American Mercantile Corp.*, 353 F.2d 147, 153 (2d Cir.1965) (constructive trust not based upon fiduciary relationship). Moreover, the fact that the revised loss payee clause did not appear in the September Policies by inadvertent error will not prevent the imposition of a constructive trust.[10] *See Simonds v. Simonds*, 45 N.Y.2d 233, 240, 408 N.Y.S.2d 359, 363–64, 380 N.E.2d 189, 193 (1978) (a wrongful act does not imply willfulness or recklessness; a mere mistake is sufficient) (*quoting Latham v. Father Divine*, 299 N.Y. 22, 85 N.E.2d 168). Although some New York courts view constructive trusts as a tool to rectify fraudulent actions, Judge Desmond noted that "a constructive trust will be erected whenever necessary to satisfy the demands of justice ... its applicability is limited only by the inventiveness of men who find ways to enrich themselves unjustly by grasping what should not belong to them." *Latham v. Father Divine*, 299 N.Y. at 27, 85 N.E.2d 168; *see also Fischer v. Wirth*, 38 A.D.2d 611, 611–12, 326 N.Y.S.2d 308, 310–11 (3d Dept.1971) (the "essential ingredients" to establish a constructive trust are that the person damaged must be induced to his detriment and that the other's unjust benefit must result from an abuse of trust relationship existing between the parties; constructive trust is a vehicle for fraud rectifying). MARAD and Chemical were the intended beneficiaries of the insurance

---

**10.** Professor Couch noted that "the right of the mortgagee or mortgagor to the proceeds of a given policy of insurance is not affected by an error made by the insurer in its designation of the person entitled to the proceeds.... Generally, the [insurance] policy is personal to the named insured so the benefit of the coverage may not inure to another. Where the interests were misdescribed, the parties could nevertheless recover under the policy to the extent of their interest in the designated premises." *Couch on Insurance*, § 29:64 at 342. Accordingly A & A's failure to inform the London underwriters of the proper loss payee clause will not prevent Chemical or MARAD from claiming the benefit of the insurance proceeds.

proceeds.[11] Thus the imposition of a constructive trust on the insurance proceeds will prevent unjust enrichment by the Debtor, its estate, and the unsecured creditors, who were never the intended beneficiaries of the insurance. *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir.1990) ("Because in a contract dispute, intent is all ...") Equity dictates that a constructive trust be imposed on the insurance proceeds, in order to effectuate the intent of the parties.

## CONCLUSION

The above constitutes the opinion of this Court. MARAD is entitled to the full amount of its claim. Chemical, as the second preferred mortgagee and additional assured of the insurance policy covering the Vessel, is entitled to the remaining proceeds to the extent that they satisfy the Chemical Mortgage.

Chemical and MARAD are directed to jointly settle an order on five (5) days notice reflecting this Court's holding.

---

11. Mr Candilora, the Vice President of A & A, noted, in his deposition, that "the intent of all the policies was to have the correct ones [,loss payee clauses,] in there." Candilora Dep. at 78. In addition, a letter from Mr. Mendoza, assistant manager of Chemical, to Mr. Candilora, dated June 10, 1986, noted that Chemical held a second preferred mortgage on the Vessel. Thus the revised loss payee clause supplied by Chemical to A & A secured Chemical's status as second preferred mortgagee and named Chemical as additional assured. Mr. Candilora did not contest Chemical's interest, rather he made assurances to Chemical and MARAD that the revised clause was incorporated into A & A's certificates of insurance. Furthermore, a letter from Mr.

Nutter, Vice President of A & A, to Price Forbes, the London underwriter, dated July 29, 1988, noted that the interests of Chemical and MARAD in the Vessel were clearly established. The letter stated:

We strongly urge that every effort be made to have the 1986 policies loss payee wording amended to include the interests of Whitney, as Trustee/Mortgagee, Chemical Bank, as Second Preferred Mortgagee and the United States of America as existed in the 1987 policies. Both Chemical Bank and MARAD are insisting on the protection of their interests. Clearly the intention of all parties concerned was to protect the interests of MARAD and Chemical.